713 So.2d 558 (1998)
CERTIFIED SECURITY SYSTEMS, INC.
v.
Charles YUSPEH, Quality Protection, Inc., d/b/a Quality Security, Security Acquisition Corp. and Samuel B. Katz.
No. 97-CA-2004.
Court of Appeal of Louisiana, Fourth Circuit.
April 22, 1998.
*559 Carl D. Rosenblum, Roderick K. West, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., New Orleans, for Certified Security Systems, Inc., Plaintiff-Appellant.
Charles E. McHale, Jr., New Orleans, for Charles Yuspeh, Quality Protection, Inc., d/b/a Quality Security, and Security Acquisition Corporation, Defendants-Appellees.
I. Jay Krieger, Sam L. Levkowicz, Krieger, Krieger & Levkowicz, New Orleans, for Samuel B. Katz, Defendant-Plaintiff in Reconvention-Appellee.
Before GULOTTA, J. Pro Tem., SCHOTT, C.J., and ARMSTRONG, J.
JAMES C. GULOTTA, Judge Pro Tem.
This suit was brought by Certified Security System, Inc., through its majority stockholders, against a minority stockholder defendant, Charles Yuspeh, President of the plaintiff corporation, for termination of Yuspeh's services for cause and for damages against Yuspeh, Quality Protection, Inc. d/b/a Quality Security ("Quality") and Security Acquisition Corporation ("SAC"), corporations controlled by Yuspeh. Additionally, Certified sought a judgment against Samuel B. Katz finding that he was not "holder in due course" of two promissory notes payable to Yuspeh, one in connection with a loan made to Certified and the other in connection with sale of equipment to Certified.
*560 Yuspeh, in a reconventional demand, asserted that he was discharged without cause and was entitled to salary loss and other benefits from Certified, as well as damages for physical injury and emotional anguish. Katz, in a reconventional demand, claimed that he was entitled to be recognized as a holder in due course of the promissory notes and as such, entitled to payment on the notes from Certified along with interest and attorney's fees. Yuspeh alternatively claimed if Katz was not recognized as a holder in due course of the notes, he should be recognized as owner and therefore entitled to collect on the notes.
In response to Yuspeh's reconventional demand, plaintiff asserted that should Yuspeh be deemed owner of the notes, he was not entitled to collect on either note because of the extensive damages caused to the plaintiff.
Quality, the corporation allegedly controlled by Yuspeh, in a reconventional demand, asserted entitlement to payment for certain customer accounts obtained by Quality and transferred to the plaintiff. Other reconventional demands, supplemental and amended petitions and cross-complaints were filed by the parties; however, for our purposes those pleadings need not be discussed here.
The facts are that Yuspeh was a shareholder, officer and director of Certified. Certified was in the business of owning residential and commercial security alarm accounts and providing installation, repair and monitoring of these accounts. Katz had been a majority shareholder in Certified. Hansen Koch and David Koch purchased Katz's majority interest in the plaintiff corporation and became directors and officers of Certified as well as the majority stockholders. Yuspeh, President of the corporation, exercised responsibility for day-to-day operations of the security company. Yuspeh was also a member of the Board of Directors.
After purchase by the Kochs of Katz's interest, Yuspeh loaned to Certified $35,000.00, an advance evidenced by a promissory note dated December 16, 1992. Thereafter, one of the companies allegedly controlled by Yuspeh, SAC, received another promissory note dated March 25, 1993, evidencing payment for certain equipment purchased by the plaintiff corporation from SAC. That note was not made payable to SAC, but to Yuspeh individually. After the discharge of Yuspeh by the plaintiff corporation, Katz came into possession of the two promissory notes.
The trial judge held that Certified "had legal cause to terminate the employment contract between it and Charles Yuspeh." He further found the termination of Yuspeh to be procedurally valid and awarded to plaintiff a money judgment against Yuspeh in the amount of $5,314.00. The trial judge's findings were "based upon Mr. Yuspeh's actions in deliberately keeping the financial condition of the company, particularly the accounts payable, from the knowledge of Hansen Koch and the Board." The trial judge further found that Katz, as a holder in due course, was entitled to recover on the two promissory notes. Attorney's fees were set in the amount of $4,500.00.
In reasons for judgment, the trial judge enumerated the $5,314.00 award to plaintiff from Yuspeh as follows:
$1,000.00 for jewelry credit for Yuspeh from TaTa Imports;
$800.00 and $1,114.00 for alarms for Yuspeh's daughters; and
$2,400.00 for service calls by Certified to Quality customers.
Certified, appealing, claims (1) while the trial judge properly found Yuspeh was discharged for cause, the damage award is inadequate; (2) the trial judge erred in finding Katz to be a "holder in due course" of the two promissory notes; and alternatively, if Katz is deemed to be a "holder in due course," he is only entitled to payment of part of the face value of the notes.
In connection with its first contention, Certified and Hansen Koch were approached by Yuspeh to purchase security alarm accounts from Quality Security, a competing company. When Certified and Koch declined the offer, Yuspeh requested that he be given authority to acquire the accounts with the intent of quickly transferring them to Westinghouse Electric Company. Certified authorized Yuspeh to acquire the accounts under the condition that he continue to devote his time *561 and effort primarily to the performance of his duties and obligations to Certified.
Certified claims that Yuspeh committed it to perform extended service work beginning in January, 1993, for accounts which were being transferred to Westinghouse. These accounts allowed the customer to receive unlimited servicing of their alarm systems in return for a set monthly fee. Certified asserts that irrespective of the fact it was performing all service work under the extended service contracts, Westinghouse or Quality was receiving the money without, in turn, making payment to Certified.
According to plaintiff, Yuspeh knew this and intentionally withheld this information from the Board of Directors. According to the minutes of the Board meetings, Yuspeh stated that Quality would receive the payments from Westinghouse and then Quality would in turn make the payments to Certified. Certified points out Yuspeh contradicted, at other board meetings, the payment plan as outlined above and stated Westinghouse would make payment directly to Certified. Plaintiff asserts that although it has performed the service contract work for Westinghouse accounts, it has not received any income.
There also exists a dispute as to whether Certified was to receive the full monthly fee on each extended service agreement or simply a certain amount per service call. According to plaintiff, that loss of income amounted to $72,190.68. Certified argues that supportive of its income loss, is the assertion made by Yuspeh, in a dispute with Westinghouse, that $108,558.95 in extended service contract income was due to Certified.
The second part of Certified's claim for an increase in damages against Yuspeh is based on the concealment of its financial condition relative to lost income from 159 former Westec accounts. According to Certified, at the time it agreed to purchase these accounts, Yuspeh did not inform plaintiff that it would not have unlimited access to Westec manufactured parts needed to service and maintain these accounts. Certified asserts that it lost income amounting to $147,838.80. Certified claims that because of the unavailability of parts, there was difficulty in servicing these Westec accounts resulting in dissatisfaction among the plaintiff corporation's customers. Certified further claims that had it known of the difficulty in obtaining parts, it would not have committed to acquire these 159 accounts. Ultimately, Certified claims it was required to sell these accounts to a Westec franchisee at a substantial loss.
On the other hand, Yuspeh, Quality and SAC, appellees, claim (1) Yuspeh was terminated without a properly called meeting of the Board of Directors and without his having an opportunity to be heard before the Board; (2) Certified failed to pay Yuspeh six months in salary under his employment contract and $200,000.00 for loss of employment income because of his "non-compete agreement" as well as an additional $100,000.00 for embarrassment and termination; (3) the trial judge failed to recognize Yuspeh's claim for $11,231.00 for money loaned to Certified; (4) in the event Katz is held not to be a holder in due course of the notes, Yuspeh should be decreed the owner, and judgment should be rendered in his favor for the amount due on the notes; (5) the trial judge failed to award to Quality the amount due by Certified for unpaid Westec accounts; (6) the trial judge erred in rendering a $2,400.00 judgment against Yuspeh instead of against Quality.
According to Yuspeh and Quality, evidence was lacking concerning a showing by Certified of any claim based on the purchase of the Westec accounts by Certified as well as how many of the originals accounts purchased were not serviced because of a lack of parts. Yuspeh further claims evidence is lacking to show how many of the Westec accounts had extended service plans in effect and how much revenue was owed to Certified by Westec's customers. Yuspeh asserts further that Certified was paid for all of the service calls made to Quality customers, except forty (40) calls for which the trial judge properly awarded $2,400.00. However, according to Yuspeh the award should have been against Quality and not against Yuspeh personally.
Despite Certified's claim that the basis alleged for Yuspeh's termination was his failure to provide accurate information to and *562 withholding information from the plaintiff corporation, Yuspeh asserts the real basis for his termination was his involvement with Quality's purchase of the Westec accounts. Yuspeh points out that the accounts were offered to Certified and when Certified refused to purchase these accounts, he purchased the accounts for Quality with the intent to sell them to Westinghouse and thereby eliminate some of Certified's competition.
In a Reply Brief, Certified claims that once the trial judge found Yuspeh's termination was for cause, and that he engaged in improper actions, the judge erred in not awarding substantial monetary damages to Certified. In connection with Yuspeh's discharge, Certified claims that Koch, as Chairman of the Board, had authority to immediately terminate Yuspeh's employment. Certified further argues that Yuspeh's claim seeking $11,231.00 allegedly loaned by him to Certified was properly rejected by the trial judge. According to Certified, no testimony was offered to support proof of this loan. Certified, in response to Yuspeh claim, asserts that Katz, who was responsible for Certified's financial affairs at the time of the alleged loan, testified that he was unaware of any loan to Certified by Yuspeh. With respect to Quality's claim that it was entitled to damages regarding 108 Westec accounts, the trial judge rejected this claim finding an absence of proof of ownership by Quality of Westec accounts.
In connection with Certified's contention that Katz is not a holder in due course of the two notes, Certified claims the evidence established that the payments for the promissory notes were in fact not payments but a loan. According to Certified, on March 28, 1994, a check was given by Katz to Yuspeh in the amount of $10,000.00 in partial payment and was designated as a "loan against certified note." On April 21, 1994, Certified claims that Katz issued a second check to Yuspeh in an additional amount of $5,000.00 in partial payment, again designated as a "loan." It is Certified's contention that the notes were only collateral for a loan. The loan designations were written by Katz on two of four checks ultimately issued.
Further, Certified argues a letter written by David Stone on behalf of Yuspeh, subsequent to Katz acquiring the notes, stated that Yuspeh sought to "pledge" these notes. According to Certified, because Katz was aware at the time of the transaction that Certified had terminated Yuspeh's employment, Katz knew of potential problems with enforcing collection of the notes and therefore did not take the notes in "good faith."
Alternatively, Certified claims Katz is entitled only to reimbursement of the amount of money he paid for the notes.
Katz claims the trial court's judgment finding him to be a holder in due course of the promissory notes should be affirmed. However, Katz argues the amount of attorney's fees awarded by the trial judge, i.e., $4,500.00, should be increased to $9,000.00 and an additional $3,000.00 should be awarded for attorney's fees incurred on appeal. Katz further argues he paid to Yuspeh $43,000.00 in installments for the purchase of the notes; that the notes were endorsed properly by Yuspeh and were delivered to Katz. Katz finally claims that he purchased the notes in good faith with no information or knowledge of any infirmity or defense on the notes.
In reference to the Stone letter, Katz contends this letter was never introduced into evidence and is not a proper exhibit for consideration. Further, Katz claims that Stone, as attorney for Yuspeh and not Katz, had no authority to make any statements regarding property owned by Katz. Katz argues the fact that he purchased the notes at a discount cannot lead to a conclusion that this constituted an infirmity on the note or affected his position as a holder in due course.
In its Reply Brief, Certified claims the notations on the notes indicating a loan destroys the credibility of Katz's position as a holder in due course. Certified also claims that the absence of any type of business loss taken on Yuspeh's tax returns supports the position that Katz is not a holder in due course. In response to Katz's argument that the Stone letter was not admitted into evidence, Certified contends this is simply not *563 true since the trial judge admitted it into evidence.

PROCEDURAL AUTHORITY TO TERMINATE
The initial question with which we are faced is whether a resolution of the Board of Directors was required to terminate Yuspeh or whether Hansen Koch, as Chairman of the Board, had the authority to do so without calling a meeting of the Board of Directors. The three directors of the plaintiff corporation were the Koch brothers and Yuspeh.
It is clear that no meeting of the Board of Directors of Certified was called for the purpose of considering the termination of Yuspeh. It is also clear that the two majority directors, Hansen and David Koch, agreed on Yuspeh's termination. Yuspeh was terminated by action of the Chairman of the Board of Certified, after informal discussion of the issue with his brother, the third member of the Board. It is significant to recognize that despite Yuspeh's position as President of the Certified, he was nonetheless discharged for cause as an employee by the Chairman of the Board.
However, at the time of his termination, March 18, 1994, Yuspeh's employment with the corporation was governed by an employment agreement entered into on September 24, 1993. This agreement was pursuant to a resolution adopted on the same date authorizing Yuspeh's employment. One of the transactions contemplated by the unanimous consent was the execution and proper administration of Yuspeh's employment agreement.
Yuspeh's employment with Certified was terminated under Sections C(2) and C(4) of Paragraph 7 of the employment agreement.[1] By executing this agreement, Yuspeh acknowledged and understood his employment with Certified could be immediately terminated should his conduct fall within the provisions of paragraph 7 of the employment agreement.
When considering (1) the composition of the Board of Directors; (2) the fact that two majority directors were in agreement that Yuspeh be terminated; (3) the responsibility of the Chairman to exercise his authority in the management and affairs of the corporation (See: La. R.S. 12:82D and La. R.S. 12:82E); (4) together with the terms of the resolution and provisions of the employment agreement, we are lead to conclude that Hansen Koch, as Chairman, had the authority to terminate Yuspeh's employment without the necessity of calling a board meeting for that purpose.
It is also clear that Yuspeh's termination would have been ratified by the Board, if indeed the Board had been called upon to do so. See: Kemna v. Warren, 514 So.2d 237, 238-239 (La.App. 5th Cir.1987). Corporations may be bound by acts of a corporate official, even though the act of the official was performed without formal authority, in those circumstances where it is shown that the act was in turn ratified. Such ratification may be express or implied, provided the action is not prohibited by the corporation charter, by statute, or is not contrary to public policy. Any actions which are ratified by the corporation are, in addition, given retroactive effect. Kemna, 514 So.2d at 239; Graves v. Concordia Elec. Co-op., Inc., 929 F.Supp. 983 (W.D.La.1996).
The testimony of both Hansen and David Koch establishes they were in agreement *564 with respect to Yuspeh's termination. Therefore, had a formal board meeting been conducted, corporate authority would have been granted for Koch to terminate Yuspeh's employment. Under these circumstances, requiring the Board to call a formal meeting to be held for the purpose of terminating Yuspeh would indeed have been a vain and useless act. The law does not require such acts. See: Moore v. St. Paul Fire & Marine Insurance Company, 251 La. 201, 203 So.2d 548, 553 (La.1967); Centanni v. A.K. Roy, Inc., 258 So.2d 219, 224 (La.App. 4th Cir. 1972).

CAUSE
We next address the issue of whether Yuspeh's termination was properly based on cause. The trial judge found that Certified had cause to terminate Yuspeh's employment contract. The basis of the Court's finding was Yuspeh's actions in "deliberately keeping the financial condition of the company, particularly the accounts payable, from the knowledge of Hansen Koch and the Board." We find no error.
The record is replete with testimony and documentary evidence setting forth the unacceptable level of Yuspeh's performance with respect to his obligations and responsibilities to Certified. Specifically, Ken Boudreaux, Certified's comptroller, and Hansen Koch stated that it was Yuspeh's practice of providing Board members with false and misleading information concerning the financial condition of the Company, particularly with respect to accounts payable. Testimony of Boudreaux and Koch as well as Certified's billing clerk, Patricia Cannon Gottschalk, established that Yuspeh instructed Certified's billing clerk to withhold from placing on the financial books of Certified certain accounts payable information until funds were received to make payment. Yuspeh continued to instruct the billing clerk to withhold this information, despite having specifically been advised by Hansen Koch to cease from doing so and to include all information regarding accounts payable in the financial records of the Company.
Koch and Boudreaux also testified that Yuspeh frequently misled the Board regarding the status of revenues from the sale and service of Westec security alarm accounts, especially with respect to the extended service protection plan income. Further, the testimony of Koch and Cray Palmer, a Certified employee, revealed that Yuspeh engaged in the practice of falsifying records so that the company could maintain its certification. Koch further indicated that Yuspeh was not forthcoming in providing full disclosure regarding the nature of the transaction by which he became involved in purchasing and selling Westec security system accounts. Additionally, the testimony of Koch was that Yuspeh caused Certified to purchase approximately one-hundred fifty-nine alarm accounts which Certified was unable to properly maintain and service because of an inability to obtain manufacturer's parts. Further, testimony from Hansen Koch and other employees of both Certified and Quality Protection, Inc. established that Yuspeh devoted considerable business and professional time and effort away from his responsibilities and obligations to Certified in direct contravention of his employment agreement and mandates given to Yuspeh by Koch. Although Yuspeh was authorized by the Board to transact business outside of his duties to Certified in connection with acquiring Westec accounts, Yuspeh in effect set up a separate business to acquire security alarm accounts for a quick and profitable resale. In doing so, he began to devote considerable time and effort away from his responsibilities and obligations to Certified to the detriment of the company, all contrary to Yuspeh's duties and obligations under his employment agreement and a breach of his fiduciary duty to Certified. See La. R.S. 12:91; Dunbar v. Williams, 554 So.2d 56 (La.App. 4th Cir. 1988). This level of conduct supports the trial judge's conclusion that Yuspeh's termination was for cause.

CERTIFIED'S CLAIMED LOSSES
Certified claims it lost approximately $72,190.68 in extended service plan income and approximately $147,838.80 in lost income because of the diminished value of one-hundred fifty-nine former Westec accounts, allegedly attributable to Yuspeh's conduct. The trial *565 judge determined that, other than the amounts awarded, Certified had not sufficiently proved the damages claimed. We agree.
The first aspect of Certified's claim for damages is that Yuspeh committed the plaintiff corporation to perform extended service work beginning in January, 1993, for Westec accounts acquired by Quality Protection which were ultimately to be transferred to Westinghouse Electric Corporation. Many of these accounts had what is referred to as an extended service protection ("ESP") option which allowed the customer to receive unlimited servicing of their alarm systems in return for a set monthly fee. The revenue attributable to this fee income is referred to as ESP income. Certified contends it was to receive this monthly income irrespective of whether a service call was made to an ESP customer. On the other hand, Yuspeh claims Certified would be paid a set amount of $60.00 per service call made with respect to an ESP customer, and only if a service call was made.
Certified, again primarily through the testimony of Boudreaux, its comptroller, claims $72,190.68 in this lost ESP income. Boudreaux commenced working at Certified in November, 1993 and, was not privy to or familiar with any of the events which transpired approximately eighteen months earlier in the transactions spearheaded by Yuspeh to acquire the Westec account. The exhibits submitted in support of its damage claim consisted of a list of approximately four hundred customer accounts compiled by Boudreaux. He testified that he had obtained the information from a report of Westinghouse customers, but admitted he did not know how the report was compiled or from whom or where the information was obtained. He admitted he could not vouch for the accuracy or authenticity of the report nor could he indicate whether Certified ever performed services under the ESP plan on any of the accounts. He also could not indicate whether any of the accounts Quality sold to Westinghouse had been cancelled or remained on Westinghouse's books for any lengthy period of time. Boudreaux further indicated he had not previously examined a document from Westinghouse's counsel to the attorney for Quality regarding ESP service income. After an extended colloquy, Boudreaux admitted he would have had to use information from this document to make a proper mathematical analysis regarding ESP income allegedly due Certified. Boudreaux admitted he had no knowledge of the exact nature of the transaction between Quality and Westinghouse or as to the number of accounts originally sold by Quality to Westinghouse, who remained Westinghouse customers. He also had no information concerning the number of customers which cancelled service after the original sale.
Boudreaux also admitted Certified was paid approximately $89,000.00 in connection with this transaction on former Westec accounts, but could not testify as to whether these payments were for ESP service calls or other type of service. Boudreaux also could not identify whether any of the 159 accounts sold by Quality to Certified had the ESP protection plan or did not subscribe to the plan.
Boudreaux's testimony was contradicted by Yuspeh. As part of extended pretrial discovery, Yuspeh and Quality were able to obtain all of the service slips reflecting services performed on accounts by Certified during the time period in question. Yuspeh then separated the service slips into those that had "no ESP" from those which were identified as "ESP accounts". Yuspeh was then able to examine each of the service slips concerning service calls by Certified and out of approximately 440 service calls, Yuspeh identified only forty calls made to customers with ESP. He stated that the normal service price was $60.00 per service call and, therefore, Quality owed Certified only $2,400.00 for unpaid ESP revenue.
Based on the foregoing, we conclude that Certified did not sufficiently meet its burden of proof on this question of damages in the amount of $72,190.68 in lost ESP income. We further find no error in the trial judge's holding that Certified is owed $2,400.00 for unpaid ESP revenue; however, this judgment is more properly assessed against Quality Protection, Inc. rather than against Yuspeh. This sum is owed by Quality Protection, *566 Inc. and not by Charles Yuspeh personally.
Certified purchased Westec accounts from Quality Protection. These accounts formed part of the original accounts that Quality had acquired and intended to sell to Westinghouse, but for some reason, either Westinghouse did not want the accounts or the customers did not want to become Westinghouse customers. In 1994, Certified sold these accounts, including the remainder of the Westec parts and equipment inventory. The plaintiff claims $147,838.80 in lost income because of the reduced sale price Certified received from the sale of these accounts.
Hansen Koch testified that one of the major reasons for selling these accounts was the company's inability to obtain Westec manufactured parts needed to properly service and maintain these accounts. In addition to Koch's testimony, Certified introduced the testimony of Virginia Gibbs and Harry Griggs, present owners of a Westec franchise which ultimately purchased the remaining parts and accounts from Certified. These parties testified that Westec manufactured parts could only be sold to a Westec franchisee and to no other party pursuant to Westec's franchise agreements. Based on that testimony, Koch claims that because of an inability to obtain Westec manufactured parts, Certified, not a Westec franchisee, could not properly service and maintain the Westec accounts.
Yuspeh, on the other hand, testified he had no trouble obtaining Westec parts. He indicated that not all of the one-hundred fiftynine accounts had Westec systems requiring Westec parts and equipment for service and maintenance.
Isaac McDavitt, a service technician for Certified testified that he serviced all types of security system equipment. He claimed there was more than an abundance of Westec supplies in Certified's warehouse in New Orleans and he was able to service all of Certified's accounts acquired from Quality which may or may not have required the use of Westec equipment. He experienced no unusual complaints from customers and indicated that if he were not able to use Westec parts, he would substitute parts from some other manufacturer. Many of the "peripherals" for security systems referred to by Griggs were usually not Westec components so that components parts could be procured from any local supply house and were readily available. McDavitt further testified that if necessary, Certified was able to obtain Westec parts from an out-of-town supplier and that Westec supplies were always in stock and available.
Certified again submitted the testimony of Boudreaux in support this aspect of its damage claim. In connection with Boudreaux's testimony, exhibits submitted on behalf of Certified failed to establish with certainty the amount of lost revenue suffered by Certified in connection with these one-hundred fiftynine accounts. Boudreaux's analysis assumes that many of these customers would remain customers of Certified for an extended period of five years. According to Boudreaux, this was simply an assumption he made because Certified's contracts were usually five year contracts.
However, as explained by Yuspeh, there was never a guarantee that any customers were going to remain with Certified for a five year period or for any period of time. Boudreaux acknowledged there was no such guarantee made in connection with these accounts. He also did not examine the customer contracts to determine whether all had five year terms remaining. However, it is clear that these accounts remained on the books of Certified from January, 1993 to the date of the sales in June and December of 1994, approximately twenty-three months during which time Certified received recurring income. Therefore, Boudreaux admitted that Certified was receiving the monthly recurring income from these accounts during that time frame. Boudreaux further testified that he was not privy to the agreement between Hansen Koch and Yuspeh with respect to any former Westec accounts. He further testified that the one-hundred fifty-nine accounts were listed on Certified's financial records as having been originally purchased at twenty times the monthly recurring revenue. The remaining one-hundred fifty-nine accounts were eventually sold by Certified at fifteen times the monthly recurring revenue.
*567 Based on the evidence, we cannot say the trial judge erred when he did not award the damages claimed by Certified in the amount of $72,190.16 and $147,838.80. Certified simply failed to prove entitlement to these claimed amounts.

YUSPEH'S CLAIM FOR $11,231.00
In his answer to Certified's appeal, Yuspeh seeks recovery on an alleged loan he made to Certified in the amount of $11,231.00. In support of this claim, Yuspeh submitted annual financial reports of Certified prepared by the accountants for the plaintiff corporation, reflecting a note payable to a stockholder in the amount claimed. Yuspeh asserts that he was this stockholder and testified that before the Koch's became involved with Certified, he had loaned the company large sums of money, for which payments were periodically made to him. According to Yuspeh, the remaining balance owed to him was the amount claimed.
Boudreaux's testimony reflected that the amount was properly removed from Certified's accountant's compilation report because neither the company nor its accountants could locate any support for this item. Furthermore, at the time of this alleged loan, Samuel Katz was completely responsible for Certified's financial affairs. Katz testified that he oversaw all loans by Yuspeh to Certified. His testimony did not support Yuspeh's claim. Because of an absence of support in the record, we cannot conclude the trial judge erred when he denied Yuspeh's claim to this amount.

QUALITY PROTECTION, INC.'S ENTITLEMENT TO FUNDS ATTRIBUTABLE TO WESTEC ACCOUNTS
In its answer to Certified's appeal, Quality seeks payment for one-hundred and eight Westec accounts which were allegedly acquired by Certified from Quality for which Quality was never paid.
Samuel Katz, officer and director of Quality Protection, Inc., and the person who handled Quality's financial affairs, was unaware of Quality having any rights to these Westec accounts which were allegedly transferred to Certified. The trial judge recognized that there was lack of documentary proof indicating Quality's alleged ownership of these onehundred and eight Westec accounts. We agree with the trial judge that Quality failed to establish entitlement to this item of damages.

PROMISSORY NOTES
Certified contends the trial judge erred in finding Samuel Katz a holder in due course of two promissory notes, one dated December 16, 1992, in the amount of $35,000.00 and the other dated March 25, 1993, in the amount of $22,350.00. We disagree.
Louisiana law defines a holder in due course as one who takes the instrument for value, in good faith and without notice that the note is overdue or has been discharged or dishonored or was subject to adverse claims or defenses. La. R.S. 10:3-302; Courtesy Financial Services, Inc. v. Hughes, 424 So.2d 1172, 1175 (La.App. 1st Cir.1982); American Bank and Trust Company v. Sunbelt Environmental Systems, Inc., 451 So.2d 1111, 1119 (La.App. 1st Cir.1984). The record clearly establishes that Katz satisfied each of these elements.
Katz testified that when he purchased the notes they were endorsed by the payee, Charles Yuspeh, and were delivered to him. Katz also testified he paid to Yuspeh a total of $43,000.00 in installments, as the purchase price for the notes. Katz indicated he purchased the notes in good faith with no information or knowledge of dishonor, discharge, adverse claims or defenses. Finally, the notes were introduced into evidence without objection. Katz made demand for payment to Certified via certified mail. Certified refused to make payment.
We reject Certified's contention that notations on the checks given to Yuspeh by Katz, as well as a letter from Yuspeh's attorney, David Stone, in which Stone stated that Yuspeh sought to "pledge" the notes as collateral, supports a conclusion that Katz made loans to Yuspeh and did not purchase the notes.
We find it significant that Stone's letter was issued well after the date the notes were *568 purchased and acquired by Katz on March 28, 1994. We fail to ascertain how this letter imputes bad faith to Katz at the time the notes were purchased. It is clear from the explanation provided by both Katz and Yuspeh that Katz purchased the notes from Yuspeh. Katz and Yuspeh testified the notation on the checks represented partial payments on the purchase of the notes. According to Katz, after his termination by Certified, Yuspeh was in desperate financial straits and, wanted to sell the notes to obtain financing for household and living expenses as well as mortgage payments. Yuspeh simply requested the payments to be made in smaller amounts over time to meet his expenses. This uncontradicted testimony is impressive in supporting the conclusion that the notes were purchased for value by Katz through periodic payments. This testimony was fully supported by Yuspeh and was not contradicted in any way by Certified.
Considering the evidence, we cannot say the trial judge erred in finding Katz to be a holder in due course of the notes.

ATTORNEY'S FEES
The notes provided for the payment of attorney's fees. In that connection, the trial judge awarded to Katz's attorney the sum of $4,500.00. On appeal, an additional $4,500.00 is sought as well as an additional $3,000.00 for appellate representation.
While we cannot conclude that the $4,500.00 award by the trial court was an abuse of the trial judge's discretion, we hold that the attorney for Katz is entitled to an additional $2,000.00, as attorney's fees in connection with the appellate litigation.

DECREE
Having so concluded, we amend the judgment of the trial judge to award an additional $2,000.00 in attorneys's fees to Katz's attorney for services rendered in connection with the appellate litigation. We also amend the judgment of the trial judge to cast Quality Protection, Inc. in judgment in the amount of $2,400.00, for lost ESP revenue, rather than Charles Yuspeh, personally. In all other respects, the judgment of the trial court is affirmed.
AMENDED AND AFFIRMED.
NOTES
[1] 7. Termination

C. Employee's employment hereunder may be immediately terminated by the Company upon the occurrence of any of the following:
(2) Employee commits an act, or omits to take action, in bad faith and to the detriment of the Company;
(4) Employee is in breach of any of his obligations or has failed to fully or faithfully perform his obligations under this Agreement.