840 So.2d 41 (2003)
Charles YUSPEH, Julie Y. Benson, Joel Y. Ashner and Wallace Murphy
v.
Hansen E. KOCH, David E. Koch, Certified Security Systems, Inc., CSS Acquisition, L.L.C., and Michael Ditcharo.
No. 02-CA-698.
Court of Appeal of Louisiana, Fifth Circuit.
February 25, 2003.
As Amended on Limited Grant of Rehearing March 24, 2003.
*43 Michael H. Rubin, Juston M. O'Brien, McGlinchey Stafford, PLLC, Baton Rouge, LA, and Harry Rosenberg, Phelps Dunbar, L.L.P., New Orleans, LA, and William W. Hall, William W. Wall & Associates, Metairie, LA, for Defendant/Appellants, Hansen E. Koch and David E. Koch.
Lynn H. Frank, Joseph R. Ward, Jr., Ward, Nelson LLC, New Orleans, LA, for Plaintiff/Appellees Charles Yuspeh, Julie Y. Benson, and Joel Y. Ashner.
Keith R. Credo, and William C. Credo, III, Metairie, LA, for Plaintiff/Appellee, Wallace Murphy.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY, and CLARENCE E. McMANUS.
THOMAS F. DALEY, Judge.
Defendants, Hansen and David Koch, appeal a jury verdict in favor of plaintiffs, Charles Yuspeh, Wallace Murphy, and other minority shareholders in Certified Security Systems, Inc. (CSS), a closely held corporation in the commercial and home alarm system business. The plaintiff minority shareholders sued the Koch brothers, the majority shareholders, for the value of plaintiffs' stock in CSS, following a cash out or "freeze out" merger that was approved by the majority shareholders in December of 1997. The minority shareholders alleged that the merger was accomplished by breach of fiduciary duty and fraud. In particular, plaintiffs allege that the Kochs' purchase of 34 shares of CSS common stock just prior to the merger in 1997 was fraudulent and a breach of fiduciary duty. The additional shares of stock enabled the Kochs to obtain the necessary voting percentage to approve the freeze out merger. CSS was merged into CSS Acquisitions, L.L.C., a company created by the Kochs and wholly owned by them. The merger did not affect CSS's day to day operations or accounts, but the minority shareholders in CSS were excluded from any ownership interest in the new limited liability company.
Plaintiffs' suit did not seek to undo the merger, but claimed as damages the value of the minority shareholders' stock as of the day before the merger. The suit originally included a shareholders' derivative claim, but this claim was dismissed at the beginning of trial.
After an extensive trial on the merits, a jury found that Hansen and David Koch breached their fiduciary duty to the plaintiffs, committed fraud, and caused the plaintiffs damages. The jury awarded each plaintiff damages representing the value of their stock. Yuspeh was awarded $1,136,867.00, Murphy was awarded $546,575.00, and Yuspeh's daughters, Julie Benson and Joel Ashner, were awarded $196,767.00 each. The jury also awarded non-pecuniary damages for mental anguish to Yuspeh and Murphy, $100,000.00 and $300,000.00 respectively. The trial court adopted the jury findings and rendered *44 judgment against Hansen Koch and David Koch, jointly and in solido, in favor of:
Charles Yuspeh in the amount of $1,136,876.00 for his stock and $100,000.00 for general damages with legal interest from date of judicial demand until paid and 33 1/3% attorney fees and all costs of court.
Joel Yuspeh Ashner in the amount of $196,767.00 for her stock with legal interest from date of judicial demand until paid and 33 1/3% attorney fees and all costs of court.
Julie Yuspeh Benson in the amount of $196,767.00 for her stock plus legal interest from date of judicial demand until paid and 33 1/3% attorney fees and all costs of court.
Wallace Murphy in the amount of $546,575.00 for his stock and $300,000.00 for general damages with legal interest from date of judicial demand until paid and 33 1/3% attorney fees and all costs. From this judgment, the Kochs appeal.

STATEMENT OF THE FACTS
CSS was incorporated by Yuspeh, Murphy, and Michael Ditcharo in 1983.[1] One hundred (100) shares of common stock were originally authorized and issued. Yuspeh was President and majority shareholder and owned 52 shares. Murphy was on the Board of Directors and owned 25 shares, Yuspeh's two daughters[2] had 9 shares each, and Michael Ditcharo had 5 shares. In 1986 CSS needed capital to maintain its growth. Samuel Katz, a friend of Yuspeh's, invested $250,000.00 in CSS in return for one hundred (100) shares of preferred stock, one (1) share of common stock, and majority voting control in CSS. In addition, CSS and Katz executed a buy back option that permitted CSS to reacquire the stock from Katz for over $1 million dollars. In 1990, seeking to reacquire control of the company from Katz and get new capital for the company, Yuspeh learned from his bank that Hansen and David Koch (brothers) might be interested in investing in CSS. In 1990, after investigating CSS, the Kochs decided to invest in the company. The Kochs initially invested $2 million dollars, allocated as follows: $1.5 million in secured notes bearing 12% percent per annum interest and $500,000.00 for 500 shares of 12% cumulative participating preferred stock. The $1.5 million in notes was secured by a UCC security interest in the company's assets.
At the same time that the Kochs invested the $2 million dollars, Yuspeh received a 10 year right to purchase the Kochs' preferred stock for a price that essentially was greater than one-half (1/2) of the company's fair market value or a 25% percent per annum compound return on the original $2 million dollars that the Kochs invested.
In 1993, the Kochs' loan to CSS was delinquent. After extensive discussion between the Kochs and Yuspeh the loan was restructured and the Kochs lent additional monies to CSS. As part of the restructure, the 500 shares of 12% cumulative participating preferred stock was exchanged for 51% of the company's issued and outstanding common stock. The Kochs agreed not to call their existing loans that were in default. The Kochs agreed to adjust the accumulation of interest in the buy back *45 agreement of their preferred stock. Also, certain monies that the Kochs expected to earn pursuant to the 25% per year compound buy back agreement were converted to money earned for non-compete agreements and consulting agreements.
The corporate articles were also amended to require a vote of 60% percent of the shareholders to reorganize the company, down from the previous 66% percentage needed.
While CSS continued to actively sell and purchase alarm contracts, the company was operating at a loss. Yuspeh and Murphy both testified that their business strategy when they founded CSS was to build recurring monthly revenues (RMR) by sales and by acquiring accounts from smaller alarm companies. Once the RMR became large enough, they expected to sell the company or the company's accounts to a larger national alarm company for a substantial profit. Although CSS continued to grow in number of accounts, its lack of profitability was unsettling to the Kochs, who had lent to the company substantial sums of money. After 1993 Hansen Koch started taking a more active role in monitoring the company's financial position and began to question Yuspeh's financial projections.
In 1994, Hansen Koch fired Yuspeh for reporting false financial information. The testimony of the parties indicates that Yuspeh was holding back accounts payable and not advising Koch of the true current financial condition of the company.
Yuspeh sued CSS for wrongful termination and CSS reconvened asserting numerous claims against Yuspeh. After a full trial and appeal, Yuspeh lost his wrongful termination claim.[3]
In 1994, after Yuspeh's termination, Hansen Koch became the President and Chief Operating Officer of CSS. Murphy continued as the head of the sales department, but testified that his authority was restricted. Murphy quit CSS in 1996, dissatisfied with the terms of his employment.
Sometime in early 1997, Hansen and David Koch offered to buy Murphy's 25 shares of stock. In a letter dated April 14, 1997, Murphy offered his 25 shares of stock to the Kochs for $149,500.00. Pursuant to the corporate articles, Murphy placed all shareholders on notice of the offer to sell his stock, satisfying the mandatory right of first refusal set forth in the corporate articles. The Kochs rejected Murphy's offer, but countered with an offer to buy Murphy's stock for $25,000.00. According to Murphy's testimony, Koch later doubled that offer to $50,000.00. Murphy rejected this counter offer.
Although Yuspeh and Murphy were no longer active in the management of the corporation, they continued to attend annual shareholders' meetings. At each shareholders' meeting there was a review of the company's financial position and all of the parties continued to discuss the potential value of the company's accounts. At the July 1997 shareholders' meeting, the minutes show that Ken Boudreaux, the comptroller (and also a Director), reported RMR was around $120,000.00. At that same meeting, Yuspeh noted to the Board members that he had heard Entergy was purchasing companies at 45 times their RMR. The minutes show that Hansen and David Koch did not wish to sell CSS at that time.
In December of 1997, Hansen and David purchased 34 authorized but unissued, *46 shares of common stock (17 each) from the corporation at a price of $50.00 per share. Prior to this transaction, which was approved by the Board of Directors, Boudreaux requested and received a "hold harmless" agreement from the Kochs, which provided that the Kochs would indemnify him should any litigation result from the stock sale and pending merger. Also in December, the Board of Directors, which at that time consisted of Hansen and David Koch and Ken Boudreaux, proposed a merger of CSS into another company owned exclusively by the Kochs. The Kochs had obtained the opinion of Chaffe & Associates, investment bankers, that the company had a negative value because the debt CSS owed to the Kochs was greater than the company's assets, and thus the stock was worth nothing.
At a shareholders' meeting on December 30, 1997, the Kochs were joined by Ditcharo's five shares and the freeze out merger was approved. Plaintiffs had not been notified of the Kochs' purchase of the 34 shares of authorized but unissued common stock. The merger set the value of plaintiffs' stock at $50.00 per share, a sum plaintiffs felt was grossly inadequate. The plaintiffs sued defendants to obtain the value of their stock, among other claims.
SUMMARY OF ARGUMENTS
Defendants Hansen and David Koch appeal the jury's verdict, arguing numerous Assignments of Error.
Defendants argue that there are specific remedies for dissenting shareholders, stated in LSA-R.S. 12:131, which plaintiffs did not follow, and thus they have no right or cause of action for the value of their shares. Defendants have filed Exceptions of No Right of Action and No Cause of Action with this Court arguing this position.
The Kochs argue that the jury was given a prejudicial jury instruction that the "merger was improper," which was the ultimate fact that the jury had to decide. Because the jury instruction was so tainted, the Kochs argue that this Court must perform a de novo review of the evidence of liability and damages.
The Kochs argue that their purchase of the 34 shares of common stock without notice to the minority shareholders was not fraudulent or a breach of their fiduciary duty to minority shareholders, because the shareholders' agreement did not contain preemptive rights and there was no affirmative duty to notify the minority shareholders. Second, they argue that Yuspeh and Murphy were represented by counsel who reviewed all the documents and advised the plaintiffs before they signed all of the transactions in 1986, 1990, and 1993; therefore, the plaintiffs cannot allege fraud in connection with these transactions. The Kochs argue that the rights of first refusal, which are contained in the stockholders' agreement after 1986, applies only to shares currently owned by shareholders and did not include the 34 shares that were authorized but unissued and held by the corporation.
The Kochs argue that if "fraud" in fact applies here, the 1993 loan restructuring agreement they confected with CSS must be unwound, even though each plaintiff testified that they were advised by independent counsel of their choice who reviewed the documents and advised them prior to their signatures. The Kochs argue that there was no legal "duress" prior to the plaintiffs' signing. They argue that the plaintiffs' fear of losing their jobs if they didn't sign the 1990 and 1993 agreements does not constitute legal duress, which is specifically defined in the Civil Code. Defendants argue that if the 1993 restructuring agreement is unwound because of fraud, their debt to the company must be reinstated.
*47 Defendants argue that they did not breach any fiduciary duties to the corporation. They argue that if they did breach a fiduciary duty by signing the 1993 restructuring agreement, then Yuspeh, who also signed this agreement, also breached his fiduciary duties to CSS. Defendants argue that it is also clear in the law that their refusal to personally guarantee a bank loan to CSS is not a breach of fiduciary duty.
Defendants argue that it was error for the trial court to deny their Motion for Mistrial after it refused to qualify their expert witness, John Rooney, who would have testified regarding the value of CSS.
The Kochs also assign as error the jury's award of general, or "nonpecuniary," damages to Murphy and Yuspeh. They also argue that the trial court's award of attorney's fees in the amount of one third of the judgment, including legal interest, was error.

SUMMARY OF DISPOSITION
We deny the Exceptions of No Right and No Cause of Action, finding that LSA-R.S. 12:131 is not the plaintiffs' exclusive remedy in this situation. We agree that the jury instructions that included the language "improper merger" were clearly prejudicial error, and thus, we perform a de novo review of the evidence. We decline to find that the trial court erred in not granting a mistrial following its refusal to qualify John Rooney as an expert, but find that portions of his testimony were wrongfully excluded; therefore, we have considered his testimony in our de novo review. After thorough review of the record before us, we decline to find any fraud or duress in connection with the 1990 and 1993 agreements, but do find that the Kochs committed fraud and breached their fiduciary duties to CSS and to the minority shareholders in the way they purchased the 34 authorized but unissued shares in CSS. Because of that fraud and breach, we agree that the merger was improper and that plaintiffs are entitled to damages for the value of their stock before the merger. We necessarily amend the jury's damage award to take into consideration the amount of debt owed to the Kochs by CSS. Regarding the non-pecuniary damages, we reverse, finding that the evidence shows that Murphy's and Yuspeh's interest in CSS was of an overwhelmingly pecuniary nature, and that neither the law nor the evidence supports this award. We agree that the trial court's award of attorneys' fees in the amount of one third of the judgment, without an evidentiary hearing, was error. We vacate the award, and remand to the trial court for an evidentiary hearing on attorneys' fees considering the factors in State, Dept. of Transp. and Development v. Williamson, 597 So.2d 439 (La.1992).
EXCEPTIONS OF NO RIGHT OF ACTION AND NO CAUSE OF ACTION
Defendants filed with this Court Exceptions of No Right of Action and No Cause of Action. First, defendants argue that the plaintiffs' exclusive remedy for the value of their shares is under LSA-R.S. 12:131, entitled "Rights of a shareholder dissenting from certain corporate actions," the requirements of which the plaintiffs unarguably did not meet. We disagree. Nothing in the language of LSA-R.S. 12:131 or case law states that this is a minority shareholder's exclusive remedy for contesting the value of his shares in a merger. Moreover, the statute does not address fraud or breach of fiduciary duty claims. See Levy v. Billeaud, 443 So.2d 539 (La.1983). Therefore, we deny this Exception.
Defendants also argue that the plaintiffs have no cause or right of action for fraud or breach of fiduciary duty. They argue that there can be no "fraud of silence" *48 because the defendants had no duty to notify the plaintiffs that they would be purchasing the 34 authorized but unissued shares, because the shareholders' agreement contained no preemptive rights. Defendants rely on Thornton ex rel. Laneco Const. Systems, Inc. v. Lanehart, 97-1995 (La.App. 1 Cir. 12/28/98), 723 So.2d 1118, which states that Louisiana statutory law specifically grants the board of directors the power to issue and sell stock in the corporation on such terms as it determines, within the limits specified by the corporate articles, bylaws, or other shareholder agreements. The board is not required to first offer such stock to existing shareholders, unless the Articles of Incorporation provide for preemptive rights. Plaintiffs distinguish this case on several grounds. First, they note that Lanehart involved the sale of only five shares of stock, a .4% voting interest, to a third party, not an interested director. They argue that this sale did not materially affect the plaintiff's voting or ownership rights. Further, since the Lanehart plaintiff had no preemptive rights, the court found that the directors did not have to offer any of the five shares to plaintiff; the court did not address the issue of disclosure to the plaintiff.
Plaintiffs argue that officers and directors such as Hansen and David Koch are deemed to stand in a fiduciary relation to the corporation and its shareholders and must discharge their duties in good faith. LSA-R.S. 12:91; Levy v. Billeaud, supra. The duty imposed on a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts that materially affect his rights and interests. The fiduciary's duty to disclose has been held paramount to the beneficiary's duty to investigate possible conflicts of interest. Plaquemines Parish Com'n Council v. Delta Development Co., Inc., 502 So.2d 1034 (La.1987).
The Kochs' purchase of the 34 shares did not violate any stockholder's preemptive rights, because there were none under the terms of the shareholders' agreement. Their action, however, did breach their fiduciary duty to the minority shareholders. This sale had vastly different implications for the minority shareholders than the one in Lanehart. As the plaintiffs point out in brief, had they known that their voting power had been diluted by the sale of the 34 shares and that the merger was imminent, they could have sought injunctive relief pursuant to LSA-R.S. 12:130.2[4] to slow down the process and insure that they received a fair value for their shares in the merger.

JURY INSTRUCTIONS
The defendants objected to a jury instruction that used the phrase "improper merger." They argue that this instruction was extremely prejudicial because this was the very issue the jury was to address: whether the merger events in December 1997 were valid or were the result of fraud or breach of fiduciary duty by the Kochs. The instruction contains this language: "Since the original corporation and its stock no longer exist and since the minority shareholders cannot be put back in the position that they had before the improper merger, they seek the monetary equivalent of what they lost in the merger ...".
Plaintiffs respond that the court's use of this phrase merely described the plaintiffs' claims, and that the instruction as a whole was clear that the jury was to decide whether the merger was improper. We disagree, finding that the trial judge's use of this phrase was very prejudicial *49 to the defendants, because it addressed the ultimate issue the jury was to decide, and was not overcome by the instruction as a whole. We cannot say that the jury's verdict was surely unattributable to the improper instruction.
Generally, the factual findings of a jury are accorded great weight and will not be disturbed on appeal absent manifest error. [cite omitted] However, when a verdict is based upon jury instructions "that are faulty in a critical regard, the verdict is tainted and not entitled to a presumption of regularity." [cites omitted] Not every deficient jury instruction mandates a de novo review. [cite omitted] An appellate court exercises great restraint before overturning a jury verdict on a suggestion that the jury instructions were so erroneous as to be prejudicial. [cites omitted] The standard of review to determine whether an erroneous jury instruction tainted the verdict involves comparing the degree of error with the jury instructions as a whole and the circumstances of the case. [cite omitted] Therefore, the pertinent inquiry is whether the erroneous instruction misled the jury to such an extent that the jury was prevented from doing justice. [cite omitted]
Greer v. Lammico, 29,066 (La.App. 2 Cir. 4/13/98), 712 So.2d 598.
This entire case turned on whether or not the freeze out merger and actions leading up to it violated the rights of minority shareholders. A jury instruction that characterizes the merger as "improper" without some condition such as "allegedly" is clearly critical and prejudicial to the defendants.
Where a jury verdict is "tainted" due to a material error at trial but an otherwise complete trial record exists, the general rule is that the appellate should, if it can, render judgment on the record. Ferrell v. Fireman's Fund Insurance Co., 94-1252 (La.2/20/95), 650 So.2d 742.
As a result of the error in the jury instruction, we have conducted a de novo review of the evidence.

FRAUD AND BREACH OF FIDUCIARY DUTY
We conclude that the Kochs did not commit fraud in the 1993 restructuring agreement, but do conclude that they committed fraud and breached their fiduciary duty to CSS and the minority shareholders in their acquisition of the 34 shares of stock, and therefore, the jury's conclusion that plaintiffs are entitled to damages for the value of that stock will be upheld.
The Civil Code defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." LSA-C.C. art.1953. The jury was so instructed.
We agree with the Kochs that the 1993 restructuring agreement itself was not fraudulent, and agree that plaintiffs were all advised by independent counsel prior to signing the documents. However, we find that the Kochs' purchase of the 34 shares to be a breach of their fiduciary duty to the corporation and minority shareholders for the following reasons.
Fiduciary is defined as "any person, firm, partnership, association or corporation, including a usufructuary, who or which occupies a position of peculiar confidence toward any person, firm, association, partnership, trust or estate." LSA-R.S. 12:1(J). Black's Law Dictionary defines a fiduciary as "a person having duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking. A term to refer to *50 a person having duties involving good faith, trust, special confidence, and candor towards another." LSA-R.S. 12:91 provides that: "Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions."
The Kochs sold themselves the 34 shares for a price of $50.00 per share. This stock purchase was for the sole purpose of obtaining the voting percentage necessary to perform the freeze out merger and leave the minority shareholders with no ownership interest in the new entity. The Kochs sold themselves the stock for $50.00 per share, for a total of $1,700.00, in December of 1997. Yet only months earlier, around April of 1997, they had offered Murphy $50,000.00 for his 25 shares, or $2,000.00 per share.[5] Clearly, the Kochs knew that the shares of CSS were worth substantially more than $50.00 per share.
Ken Boudreaux, the only non-interested director on CSS's Board, testified that he told Hansen Koch that the minority shareholders deserved something for their stock and that he did not think it was fair for them to be "kicked out" of the company with nothing. Before voting for the issuance of the 34 shares and the freeze out merger, he insisted that CSS provide him with a "hold harmless" agreement before he would agree to approve the Kochs' purchase of the 34 shares for $50.00 each. Additionally, he requested and received a personal guaranty of the "hold harmless" agreement by Hansen Koch. Clearly Boudreaux had serious reservations about the propriety of the Kochs' actions.
The duty to notify the minority shareholders of their purchase did not come from preemptive rights in the shareholders' agreement, but from their general fiduciary duty to protect the interests of minority shareholders. This is especially important because this purchase was made with the sole purpose of accomplishing the merger to the detriment of the minority shareholders' stake in CSS.
Hansen Koch clearly knew, at the July 1997 board meeting, of the value of CSS's accounts, by the information that Entergy was buying companies for multiples of at least 45 times RMR. Other witnesses confirmed that the market was "hot" for alarm companies at this time.
Hansen Koch testified that he pulled the $50.00 per share value "out of the sky." The $50.00 value clearly had no relation to any financial information of the corporation. Hansen Koch also testified that he and his brother expected to recoup all their money once they took over 100% of the company. Hansen testified that he was "wearing a number of hats" and that in voting to issue the 34 shares and voting in favor of the freeze out merger, he "was protecting his own interest." This contradicts the Kochs' position, as per Chaffe & Associates, that CSS had negative value. Considering all of the above factors, the jury did not err in finding that the Kochs committed fraud and breached their fiduciary duty to the corporation and its minority shareholders in their acquisition of the 34 shares so that they could accomplish the freeze out merger to the detriment of the value of the minority shareholders' stock.

*51 NONPECUNIARY DAMAGES

The jury awarded Murphy $300,000.00 in nonpecuniary damages and Yuspeh $100,000.00 in nonpecuniary damages. We find that the evidence does not support this award.
Defendants argue that nonpecuniary damages are not available because LSA-C.C. art.1998 allows them only in a breach of contract case. We agree that art.1998 does not apply in this case.[6]
Courts have recognized a cause of action for mental anguish damages for breach of fiduciary duty. See Montet v. Lyles, 93-1724 (La.App.6/24/94), 638 So.2d 727. In Johnson v. First Nat'l Bank of Shreveport, 2000-870 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, the court noted that contemporaneous physical injury is not always required for mental anguish damages, though in that particular case, the court found a contemporaneous physical injury. In the instant case, we find that Yuspeh and Murphy failed to prove that they suffered compensable mental anguish in this case.
Both Yuspeh and Murphy testified that it was their primary hope to build up CSS and sell it to a larger company in order to fund a comfortable retirement. This was their goal both before and after the Kochs became investors in CSS. Yuspeh was fired for cause in 1994; Murphy resigned in 1996. Neither was involved in the day to day running of the company after that. The merger took place at the end of 1997. Prior to that, earlier in 1997, both men testified that they purged the Kochs to sell the company, both wanting to capitalize on the seller's market in 1997 for alarm companies. Murphy's letter of April, 1997, in which he offers to sell his shares to the Kochs in 1997 for $149,500.00, is clear evidence of his primarily pecuniary interest in CSS at that time. We also note that in the minutes of the April 8, 1994 shareholders' meeting, Yuspeh, who had been terminated on March 18, 1994, states that he either wanted to sell his stock for approximately $1.3 million, work for someone else in the security business, start another alarm company, or do something else.
The testimony and evidence show that neither Yuspeh nor Murphy wanted to regain control of CSS and continue its presence in the local market. Despite testimony that each man was emotionally devastated by the merger, the rest of the evidence clearly shows that their interest in CSS was financial and that their loss was financial.[7] The evidence clearly shows that Yuspeh's mental anguish resulted from his firing, and Murphy's resulted from his resignation. The jury clearly erred in finding that Yuspeh and Murphy bore their burden of proof for nonpecuniary damages as a result of the merger; therefore, we reverse these awards.
VALUE OF THE STOCK
Although we have determined that LSA-R.S. 12:131 is not a dissenting shareholder's exclusive remedy, we look to the statute for guidance in establishing the value of a dissenter's stock. It requires a determination of "fair cash values of [the minority stockholder's] shares as of the day before such vote is taken." LSA-R.S. *52 12:131(C)(2). Fair cash value is the net value of the company after taking into account all expenses and debt. The "vote" referred to is "the meeting of shareholders at which such proposed corporate action is submitted to a vote." R.S. 12:131(C)(1)(a). The shareholders' meeting was December 30, 1997, so the evaluation date for fair cash value must be December 29, 1997.
The jury heard the testimony of Harold Asher, plaintiffs' expert CPA, who performed a valuation of CSS. The jury also heard from Mark Gronowski, another expert witness for plaintiff who performed another valuation of CSS. Other witnesses who testified regarding the value of CSS are Barbara Harris, the current comptroller of CSS; Ken Boudreaux, the former comptroller of CSS; Chaffe & Associates' Frances Alford and David Black Chaffe; and John Rooney, defendants' expert.[8]
Harold Asher, plaintiffs' expert CPA, valued the stock as if the company had been sold in a market sale, because the market existed for alarm companies in December of 1997, which was described as a seller's market and a "feeding frenzy." He valued the company as of January 1, 1998, several days after the merger vote. He found debt to the Kochs of $1.5 million, total stockholders' equity of $4.25 million, not including the net operating loss benefit and the tax benefit of approximately $450,000.00. Asher also deducted the $500,000.00 to the preferred stockholders, leaving $3.75 million in value to be divided by the stockholders according to their shares, which would result in $950,000.00 to Yuspeh, $450,000.00 to Murphy, and $165,000.00 each to Benson and Ashner.[9] Because Asher used January 1, 1998 as the valuation date, he refused to consider the total of more than $4 million in debt to the Kochs on the company's books on December 29, debt that both Murphy and Yuspeh agreed was validly owed to the Kochs. Asher also refused to consider the non-competition agreements and the consulting agreements as valid debt.
Mark Gronowski testified as an expert in valuing security alarm monitoring contracts for the plaintiffs. He worked for Barnes Associates, an investment banking and consulting firm, specializing in the security alarm industry. He used the market value method to value CSS, which figures a gross sales price by multiplying the RMR by a multiple. He defined RMR as the contractual obligation that the customer has in order to receive services from the service provider. RMR did not include all revenue each month, such as installation fees or servicing fees. That gross sales price is then usually adjusted for any assets and liabilities the company has. He used an RMR of $120,000.00 at plaintiffs' counsel's direction, because he was not furnished with an RMR report. He used multipliers between 40.1 and 43.3, though he testified that 46 was probably closer to what multiple CSS could have gotten in the market at that time. He concluded that CSS's value ranged from roughly $4.8 million on the low side to $5.6 million on the high side. This represented the purchase price, not the ultimate value to shareholders, since liabilities were the responsibility of the seller, he testified, and *53 would be deducted from the purchase price prior to determining what shareholders got.
Frances Alford of Chaffe & Associates was called by the plaintiffs under cross examination. She testified that she performed the research that was needed to value CSS. Though Chaffe ultimately concluded that the company's stock had a negative value because the debt to the Kochs exceeded the assets, Alford's handwritten notes indicate that she considered a value on the company of around $4.92 million dollars. She used two different RMRs, $190,000.00 and $120,000.00, and used different multipliers, one as high as 45. She used the West Book's rule of thumb analysis to make the final valuations, with a multiplier of 24.
John Rooney, the defendant's witness, was proffered as an expert in security alarm company valuation. Rooney testified that it was possible to reconstruct the RMR from source documents such as the recurring revenue register, in the absence of a specific RMR report. He calculated that in the beginning of 1997, RMR was around $121,000.00, but sank to around $100,000.00 by the end of that year. He found this decline substantial and irregular for the industry at the time.
Ken Boudreaux, the comptroller of CSS at the time of the merger, testified as a fact witness. He was hired by the Kochs after Yuspeh was fired in 1993. Boudreaux was elected a director in 1994 and the company's secretary. CSS's books were in disarray and his job was to straighten them out to get an accurate picture of the company's finances. He testified that the company lost money from 1993 to 1997, and in 1997 its liabilities exceeded its assets.
In July of 1997, Boudreaux reported to the shareholders that RMR was around $120,000.00. At that same meeting, Yuspeh reported that Entergy was purchasing alarm companies for 45 times RMR. As of September 30, 1997, the company's financial statement identified total debt of $5.014 million, of which approximately $3 million was long term debt and $1.791 million was interest due on that.
Hansen Koch testified regarding the debt CSS owed to him and David, which totaled, just before the merger, $5.3 million, which included $500,000.00 of preferred stock in CSS. The rest consisted of the amounts due on the notes, interest thereon, and the non-competition and consulting fees.
After conducting a thorough de novo review of the different experts' valuation methods, we find that the jury erred in its valuation of CSS's stock. We have used all of the evidence to conduct our own valuation. First, all of the witnesses who testified on this issue agreed that RMR is the initial cornerstone in determining an alarm company's market value. The only consistent RMR figure that the evidence offers is $120,000.00 per month, which we will use. The evidence also offered different multipliers, but the one most consistently recited was 46, considering the seller's market for alarm companies in 1997. Therefore, our initial evaluation of CSS's value is $5.4 million ($120,000.00 × 46 = $5,400,000.00). To that figure, we will add $250,000.00 for cash, accounts receivable, inventory and other tangible assets (as per Harold Asher's evaluation), for a total of $5,650,000.00.
The jury erred in not subtracting all of the debt owed to the Kochs. We have already found that there was no fraud in the 1993 restructuring agreement. We find that this debt is legitimate debt. In their testimonies, both Yuspeh and Murphy agreed that the Kochs were rightfully owed the money they put into CSS both in *54 1990 and in the 1993 restructuring agreement, which includes the non-competition and consulting fees. We find that these items were valid debt; they were a way to restructure the original 1990 debt owed to the Kochs, which Yuspeh and Murphy agreed was legitimate. The evidence shows that the debt to the Kochs totaled approximately $5.3 million, including $500,000.00 in preferred stock. We subtract the amount for preferred stock from the total debt, since the 1993 restructuring agreement converted the preferred stock to common stock, and find that the total debt owed to the Kochs was $4.8 million. We add to that the $65,000.00 loan that Hansen Koch made to CSS in December 1997, and also add back the $1,700.00 purchase price of the 34 shares, for a total debt of $4,866,700.00. Subtracted from $5.65 million, this leaves $783,300.00 to be divided up among the shareholders according to their percentages before the Kochs' purchase of the 34 shares. Out of 204 shares outstanding, the Kochs had 52 each, Yuspeh had 52 (25.49%), Murphy 25 (12.26%), Benson and Ashner 9 each (4.41%), and Ditcharo 5. We, therefore, award Yuspeh $199,663.17; Murphy $96,032.58; and Benson and Ashner $34,543.53 each, plus interest from the date of judicial demand as well as all court costs at the district court level. Each party is to bear their own costs of appeal.
We vacate the award of attorneys' fees, and remand for an evidentiary hearing to set attorneys' fees in light of the criteria in State, Dept. of Transp. and Development v. Williamson, 597 So.2d 439 (La.1992).
AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART.
NOTES
[1] The suit originally named Michael Ditcharo, owner of 5 shares of stock, who voted with Koch brothers for the merger, as a defendant, but he was dismissed prior to trial.
[2] The evidence shows that Yuspeh effectively controlled these 18 shares in addition to his 52. His daughters were not involved in the day to day operations of CSS and Yuspeh nearly always voted their shares by proxy.
[3] Certified Security Systems, Inc. v. Yuspeh, 97-2004 (La.App. 4 Cir. 4/22/98), 713 So.2d 558.
[4] R.S. 12:130.2 is found in the subchapter entitled "Dissenting Shareholders' Rights, Fair Price Protection, and Control Share Acquisition."
[5] Murphy valued the shares at $250,000.00, but offered them to the Kochs for $149,500.00.
[6] The jury was instructed that an award for mental anguish "as a result of damage to property" was recoverable. This suit, however, was not about damage to property. Plaintiffs' suit alleged economic damages for the loss of income and the loss of value of their shares. The line of cases authorizing awards for mental anguish to property owners for damage to property contemplates physical damage to corporeal property.
[7] Murphy's testimony regarding his emotional loss relates primarily to his resignation in 1996.
[8] The trial court refused to qualify the defendants' expert, John Rooney, and so the jury never heard his opinion on the value of CSS, nor were the defendants allowed to question him regarding his opinion of plaintiffs' experts' conclusions on the value of CSS. Because we have performed a de novo review of the evidence, we have considered John Rooney's proffered testimony.
[9] If the tax benefit was added back of approximately $200,000.00, that would be assigned primarily to Yuspeh and Murphy.